*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0056p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GERALDINE LIVERMORE, Personal Representative
for the Estate of Roland E. Rohm, deceased,
                                    *Plaintiff-Appellee,*

        *v.*

DANIEL LUBELAN and JERRY ELLSWORTH,
                                    *Defendants-Appellants.*

No. 06-1465

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 04-00552—Richard A. Enslen, District Judge.

Argued: December 8, 2006

Decided and Filed: February 7, 2007

Before: BATCHELDER and GRIFFIN, Circuit Judges; PHILLIPS, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Margaret A. Nelson, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Herbert A. Brail, KEANE & KEANE, Dearborn, Michigan, for Appellee. **ON BRIEF:** Margaret A. Nelson, Mark E. Donnelly, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Christopher J. Keane, KEANE & KEANE, Dearborn, Michigan, for Appellee.

_____

**OPINION**

_____

        GRIFFIN, Circuit Judge. Defendants Daniel Lubelan and Jerry Ellsworth appeal the denial of their motion for summary judgment brought pursuant to FED. R. CIV. P. 56(c). Defendants argue that the district court mistakenly concluded that genuine issues of material fact precluded the entry of summary judgment and that it failed to consider whether defendants were entitled to qualified immunity from plaintiff Geraldine Livermore's Fourth Amendment claims. Defendants argue further that Livermore's state law claims of gross negligence fail as a matter of Michigan law. For

_____
        [*]The Honorable Thomas W. Phillips, United States District Judge for the Eastern District of Tennessee, sitting by designation.

the reasons set forth below, we reverse the district court's denial of defendants' motion for summary judgment.

I.

Thomas Crosslin and decedent Roland Rohm operated the Rainbow Farms Campground ("Rainbow Farms") in Cass County, Michigan. Crosslin and Rohm advocated the legalization of marijuana and often sponsored concerts and camp-outs on Rainbow Farms to espouse their views. After receiving complaints about illegal drug use occurring on Rainbow Farms, the Cass County Sheriff's Department initiated an undercover investigation of Crosslin and Rohm. Crosslin, as owner of Rainbow Farms, was subsequently charged with violating public health laws and forfeiture proceedings against Crosslin and his property were initiated.

After a search warrant was issued, investigators discovered a "marijuana grow operation" in the basement of Crosslin's and Rohm's residence on Rainbow Farms. Consequently, more criminal charges were filed and a Family Independence Agency investigation began, resulting in the court-ordered removal of Rohm's young son, Robert, from Crosslin's and Rohm's residence on Rainbow Farms. In August 2001, Crosslin and Rohm violated an injunction prohibiting them from sponsoring any more events on the farm and were subsequently held in contempt by the Cass County Circuit Court.

On August 31, 2001, after failing to appear at a scheduled show cause hearing in connection with their contempt order, Crosslin and Rohm set fire to the outbuildings on Rainbow Farms and barricaded themselves in their residence. The Cass County Sheriff's Department set up observation points around Rainbow Farms, closed off the perimeter, and requested assistance from the Michigan State Police's Emergency Services team ("Emergency Services") to resolve the standoff at Rainbow Farms and to arrest Crosslin and Rohm. Crosslin confronted the arriving police officials armed with a gun and refused them permission to enter his property.

That evening, Crosslin shot at and struck a news helicopter as it flew over his property, taking aerial footage of the fires. Emergency Services, commanded by defendant Lieutenant Jerry Ellsworth, and FBI personnel responded to Cass County's request for assistance and began arriving on the morning of September 1. On September 3, Crosslin and an accomplice – later identified as Bradon Peoples – exited their residence and walked through the woods to a neighboring home, where they broke in and stole supplies. On their return, Crosslin was shot and killed by an FBI agent in self-defense. Peoples was arrested.

During the early morning hours of September 4, Emergency Services began negotiating with Rohm by phone. Rohm indicated that he would come out of the house and surrender at 7:00 a.m. if he were allowed to speak with his son. The negotiator agreed, and Rohm was instructed to come out to the street unarmed with his hands up. The Rainbow Farms residence began burning at 6:00 a.m. that morning, apparently set on fire by Rohm. At approximately 6:30 a.m., Rohm exited the house armed with a rifle and hid between two trees in the backyard, near the northwest corner of the house. What happened next is the subject of dispute between the parties.

After Rohm fled his residence and hid between the trees, Emergency Services members Sergeant Steven Homrich, Sergeant David Bower, and Lt. Ellsworth approached Rohm in a Light Armored Vehicle ("LAV").[1] Because of the LAV's armor plating, Emergency Services's radios did not work inside the vehicle. To allow radio communication, Sgts. Homrich and Bower were placed in open hatches in the roof of the LAV, exposed from their mid-torsos to the tops of their heads. The LAV approached Rohm's residence as Lt. Ellsworth identified himself via a loudspeaker and

----

[1] An LAV is an armored vehicle designed to stop up to a .50 caliber round.

directed Rohm to surrender, but Sgts. Homrich and Bower were unable to see him due to the lack of daylight and the smoke emitting from the house.

Emergency Services snipers on an observation point approximately 150 yards northwest of the house, however, were able to see Rohm. Defendant Sgt. Daniel Lubelan, a Michigan State Police Trooper, observed Rohm in a crouched or kneeling position, holding his rifle at waist level and turning his torso back and forth as if looking for someone. According to Sgt. Lubelan, Rohm identified the LAV and aimed his gun in its direction, tracking the LAV as it moved. Sgt. Lubelan believed that Rohm was pointing his gun toward an exposed officer in the LAV and fired two shots at Rohm, killing him.[2]

On August 17, 2004, plaintiff Geraldine Livermore, Rohm's mother and personal representative, filed a complaint in the Eastern District of Michigan. Livermore alleged that Sgt. Lubelan used excessive force in shooting Rohm, and that Lt. Ellsworth acted negligently in creating the circumstances that led to Rohm's death. On November 29, 2005, defendants moved for summary judgment, arguing that Sgt. Lubelan's use of force was reasonable, that defendants were entitled to qualified immunity, and that Livermore's gross negligence claims failed as a matter of Michigan law on the facts of this case. The district court denied defendants' motion on February 17, 2006, finding that genuine issues of material fact existed.[3]

Defendants filed this interlocutory appeal on March 17, 2006.

## II.

We first consider whether we have jurisdiction to address defendants' interlocutory appeal. Title 28 U.S.C. § 1291 limits this court's jurisdiction to "final decisions of the district courts of the United States. . . ." A district court's denial of qualified immunity is an appealable final decision pursuant to 28 U.S.C. § 1291, but only "to the extent that it turns on an issue of law." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). A defendant raising a qualified immunity defense "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995); *see*

---

[2]Livermore disputes that Rohm was aiming his rifle toward the LAV when he was fired upon.

[3]Specifically, the Honorable Richard Enslen found that the following issues of fact precluded the grant of summary judgment:

> While Defendant Lubelan has testified that he shot the decedent in the back when the decedent was swinging his rifle toward the approaching armored vehicle, his testimony is contradicted by the autopsy (which showed that the bullet entered through the decedent's chest). Lubelan's contention that the decedent was aiming toward the armored vehicle is contradicted by the affidavit of Plaintiff's ballistics expert John Thornton – which concluded, based on all ballistics calculations – that the angle of the entry wound indicated the decedent was not facing the direction of the armored vehicle at the time he was shot. Lubelan's testimony that the decedent was aiming his rifle with his left-hand is similarly contradicted by his step-father and fellow hunter who has sworn that the decedent was not a left-handed shooter. Lubelan's premise that the shooting was necessary to protect two officers (Steve Homrich and Dave Bower) whose upper torsos were exposed as they were traveling in their armored vehicle is contradicted by those officers' past statements (given to investigators) that their vehicle was repositioning, in a covered location while they were inside the vehicle, at the time the shots were fired. Likewise, Lubelan admitted in deposition testimony that he did not see officers in the armored vehicle exposed when he fired. Plaintiff's law enforcement practices expert, D.P. Van Blaricom, has also provided reliable opinion evidence that the police practices used and ordered by Jerry Ellsworth were reckless and contributed to the use of excessive force. His conclusions include that the fatal incident was triggered by the unjustified and reckless decision to rush the suspect, without warning, at a time when he was trapped and did not pose any imminent threat.

*also Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) ("A defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law."). Nevertheless, that the district court here denied defendants' motion for summary judgment on the grounds that genuine issues of material fact exist does not necessarily preclude this court's jurisdiction over defendants' appeal. Rather, as this court has recognized, *"regardless of the district court's reasons* for denying qualified immunity, [this court] may exercise jurisdiction over the [defendants'] appeal to the extent it raises questions of law." *Williams v. Mehra*, 186 F.3d 685, 689-90 (6th Cir. 1999) (en banc); *see also Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).

Language in our earlier decisions interpreting *Johnson* suggests that where, as here, the appellant fails to concede the facts as alleged by the appellee, this court is completely deprived of jurisdiction over the appellant's interlocutory appeal. *See Berryman*, 150 F.3d at 563 ("If . . . the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal."). Subsequent cases, however, have rejected that approach and clarified that we may consider a pure question of law, despite the defendants' failure to concede the plaintiff's version of the facts for purposes of the interlocutory appeal: "If . . . aside from the impermissible arguments regarding disputes of fact, the defendant also raises the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." *Estate of Carter*, 408 F.3d at 310 (internal quotations and citation omitted); *see also Smith v. Cupp*, 430 F.3d 766, 772 (6th Cir. 2005); *but see McKenna v. City of Royal Oak, et al.*, 469 F.3d 559, 561 (6th Cir. 2006) (holding this court lacks jurisdiction to consider interlocutory appeal where appellant relies solely on disputed facts). We therefore conclude that this court has jurisdiction over defendants' interlocutory appeal to consider whether, accepting the facts as alleged by Livermore, defendants are entitled to qualified immunity from Livermore's claim of excessive force. *See Mehra*, 186 F.3d at 690 (instructing that court has jurisdiction to consider whether facts, as alleged by plaintiff, entitle defendant to summary judgment); *Berryman*, 150 F.3d at 562 (same).

III.

"Through the use of qualified immunity, the law shields 'governmental officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The Supreme Court instructs lower courts to perform a two-tiered inquiry to determine whether a defendant is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts should first determine whether "the facts alleged show the officer's conduct violated a constitutional right[.]" *Id.* If the plaintiff establishes that a constitutional violation occurred, a court must next consider "whether the right was clearly established." *Id.* When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

The Court has emphasized that the qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" *Saucier*, 533 U.S. at 201. Thus, in the excessive force context, it is not enough that a plaintiff establishes that the defendant's use of force was excessive under the Fourth Amendment. To defeat qualified immunity, the plaintiff must show that the defendant had notice that the manner in which the force was used had been previously proscribed:

> [T]here is no doubt that [precedent] clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in

*Anderson* [*v. Creighton*,] "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  483 U.S. [635,] 640 . . . [(1987)].  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (quoting *Saucier*, 533 U.S. at 201-02).

## A.  Sergeant Lubelan

As *Saucier* and *Brosseau* instruct, we must first determine whether Sgt. Lubelan violated Rohm's constitutional rights by shooting him.  It is well-established that individuals have a constitutional right to be free from excessive force during an arrest.  *See, e.g., Graham v. Conner*, 490 U.S. 386, 388 (1989); *Solomon*, 389 F.3d at 173.  "[*A*]*ll* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . . "  *Graham*, 490 U.S. at 395.  "[T]he Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect."  *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  Rather, the use of deadly force is only constitutionally permissible if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ."  *Garner*, 471 U.S. at 11; *see also Sample*, 409 F.3d at 697 (noting that "only in rare instances may an officer seize a suspect by use of deadly force").  The Court has identified three factors that lower courts should consider in determining the reasonableness of force used:  (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight.  *Graham*, 490 U.S. at 396; *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006).  These factors are not an exhaustive list, as the ultimate inquiry is "whether the totality of the circumstances justifies a particular sort of seizure."  *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396).

Considering the totality of the facts and circumstances as alleged by Livermore, we hold that Sgt. Lubelan acted reasonably in firing at Rohm.  Several factors compel a finding that Rohm posed a serious threat:  Rohm helped cause the standoff that led to Crosslin's death by (along with Crosslin) setting fire to the buildings on Rainbow Farms, he was present when Crosslin fired shots at a news helicopter, and – rather than surrender as agreed upon – he exited his burning residence armed with a rifle.  In addition, Michigan State Police officers were told that Rohm and Crosslin had wired their residence with explosives.  Furthermore, although Livermore contends that Rohm was not aiming a gun at the LAV when he was shot, the first – and ultimately fatal – bullet fired by Sgt. Lubelan hit the rifle stock of Rohm's gun before entering Rohm's chest.  Thus, plaintiff's own expert, Dr. Thornton, concedes that Rohm was holding his rifle when he was shot.[4]

Despite these factors, Livermore argues that Sgt. Lubelan acted unreasonably in firing at Rohm.  Livermore relies on Dr. Thornton's affidavit to argue that Rohm was not pointing his rifle at the LAV when he was shot, and on statements made by Sgts. Homrich and Bower that they were inside the LAV at the time of the shooting.  Thus, Livermore argues, Rohm did not pose an immediate threat when he was fired upon.  We disagree.

---

[4]Although Livermore's brief contests defendants' claim that Rohm was holding a weapon at the time he was killed, Livermore conceded at oral argument that Rohm was in fact holding a rifle when he was shot.

First, we note our disagreement with the district court that Sgts. Homrich's and Bower's statements create a genuine issue of material fact concerning their whereabouts at the time Rohm was shot. In the statements at issue – derived from a Michigan State Police Incident Report filed immediately after the shooting at Rainbow Farms – both Sgt. Bower and Sgt. Homrich state that after they left their hatches and went down into the LAV, "they were informed by the perimeter personnel that the suspect had been shot." These statements, however, only suggest that Sgts. Homrich and Bower were inside the LAV when they learned that Rohm had been shot; they are silent as to whether the officers had been exposed at the time Sgt. Lubelan fired at Rohm. In our view, these statements do not contradict Sgt. Homrich's deposition testimony that he was exposed at the time Rohm was shot.

Moreover, in determining whether Rohm posed a threat of serious harm at the time he was shot, we must focus on Sgt. Lubelan's perspective:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Smith v. Freland*, 954 F.2d 343, 346-47 (6th Cir. 1992) (quoting *Graham*, 490 U.S. at 396-97). Sgt. Lubelan testified that he saw an officer exposed through the hatch of the LAV before he fired at Rohm, and that he fired at Rohm in order to prevent Rohm from firing at the LAV. Even assuming that Rohm was not aiming his rifle at the LAV when he was shot, we nonetheless conclude that Sgt. Lubelan had probable cause to believe that Rohm posed a serious threat to the officers in the LAV – particularly Sgt. Homrich – due to his proximity to the LAV while armed with a rifle, his prior violent behavior, and his continued refusal to surrender and face arrest. *Garner*, 471 U.S. at 11 (holding the use of deadly force is constitutionally permissible only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]").

Because Livermore has not shown that Sgt. Lubelan used excessive force in shooting at Rohm, we need not address whether Rohm had a "clearly established" right to be free from being fired upon. *Saucier*, 533 U.S. at 201. Sgt. Lubelan's request for qualified immunity should have been granted, and the district court's denial of defendants' motion for summary judgment with respect to Livermore's claim of excessive force against Sgt. Lubelan is reversed.

## B. Lieutenant Ellsworth

Livermore also asserts that Lt. Ellsworth, who commanded the Emergency Services team and attempted to confront Rohm in the LAV, intentionally or recklessly created the circumstances leading to Rohm's death. With respect to this claim, the district court stated that:

> Plaintiff's law enforcement practices expert, D.P. Van Blaricom, has also provided reliable opinion evidence that the police practices used and ordered by Jerry Ellsworth were reckless and contributed to the use of excessive force. His conclusions include that the fatal incident was triggered by the unjustified and reckless decision to rush the suspect, without warning, at a time when he was trapped and did not pose any imminent threat. Although this record could be interpreted otherwise, the interpretation required by Rule 56 establishes that there are genuine issues of material fact requiring the denial of summary judgment as to whether Defendants recklessly used excessive force in violation of federal and state law.

Defendants argue that the district court erred in denying their motion for summary judgment with respect to Livermore's Fourth Amendment claim against Lt. Ellsworth. They contend that Livermore's theory of recovery as to Lt. Ellsworth is not cognizable under a Fourth Amendment excessive force claim.

In support of her claim against Lt. Ellsworth, Livermore points to *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), in which the Ninth Circuit held that a plaintiff's Fourth Amendment claim against police officers who used deadly force may survive summary judgment, even where the particular seizure is reasonable, if the defendant police officers acted recklessly in creating the circumstances which required the use of deadly force. *Id.* at 1189 (stating that "even though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force because their reckless and unconstitutional provocation created the need to use force."). Although this circuit has not addressed *Billington* directly, we have rejected such an analysis. The proper approach under Sixth Circuit precedent is to view excessive force claims in segments. *Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004); *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996). That is, the court should first identify the "seizure" at issue here and then examine "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Dickerson*, 101 F.3d at 1161 (quoting *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992)). The *Dickerson* court reasoned:

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Id.* (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994)); *see also id.* at 1161-62 (citing with approval *Drewitt v. Pratt*, 999 F.2d 774, 778-80 (4th Cir. 1993) (rejecting a claim that an officer who resorts to deadly force in self-defense violates the Fourth Amendment if he unreasonably provokes the shooting by failing to identify himself as a police officer)); *id.* at 1162 (citing with approval *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (scrutinizing "only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment" because the "Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general.")).

Applying the segmented analysis here that *Dickerson* requires, we conclude that Lt. Ellsworth is entitled to summary judgment on Livermore's excessive force claim. Livermore, through her expert, asserts that Lt. Ellsworth acted recklessly by creating circumstances to justify shooting Rohm, by ordering snipers to shoot Rohm if he raised a weapon at the LAV, by failing to warn Rohm that he would be fired upon, and by "rushing" the assault on Rohm. Because Livermore argues that Lt. Ellsworth acted negligently by increasing the likelihood that Rohm would be shot, the seizure at issue is the shooting of Rohm. All of the actions concerning Lt. Ellsworth, however, occurred in the hours and minutes leading up to Rohm's killing; *Dickerson* instructs us to disregard these events and to focus on the "split-second judgments" made immediately before the officer used allegedly excessive force. *See Dickerson*, 101 F.3d at 1162 (citing *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991) and *Sherrod v. Berry*, 856 F.2d 802, 805-06 (7th Cir. 1988) (en banc)). The only force used against Rohm during the standoff was the two shots that killed him, and it is undisputed that the only officer to shoot Rohm was Sgt. Lubelan. Under *Dickerson*, the preceding decisions made by Lt. Ellsworth are immaterial and not a sufficient basis for a claim under the Fourth Amendment. We therefore reverse the district court's denial of defendants' motion for summary judgment with respect to Livermore's excessive force claim against Lt. Ellsworth.

IV.

Livermore also asserts claims of gross negligence arising under Michigan state law against Sgt. Lubelan and Lt. Ellsworth. Defendants argue that they are entitled to immunity from Livermore's state law claims under MICH. COMP. LAWS § 691.1407 unless Livermore can establish that their conduct amounted to gross negligence. Because Livermore's claims are predicated on intentional – rather than negligent – conduct, defendants contend that Livermore's state law claims fail as a matter of law. We agree with defendants and reverse the district court's denial of defendants' motion for summary judgment on Livermore's state law claims of gross negligence.

A.

In a diversity case or a federal question action involving pendent state claims, we must look to state immunity law to determine whether a denial of immunity based on state law is appealable. *Walton v. City of Southfield*, 995 F.2d 1331, 1343 (6th Cir. 1993) (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985), and *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). In *Walton*, we held that a defendant could not appeal a district court's denial of governmental immunity pursuant to MICH. COMP. LAWS § 691.1407 because it was not a "final decision" under 28 U.S.C. § 1291. *Id.* at 1344. On June 4, 2002, however, Michigan Court Rule 7.202 was amended to include as a "final order" an "order denying governmental immunity to a governmental party, including a governmental agency, official, or employee . . . ." M.C.R. 7.202(6)(a)(v). Since the 2002 amendment, we have held repeatedly that, because the denial of governmental immunity is now a "final order" providing defendants with an appeal of right to the Michigan Court of Appeals, this court has jurisdiction over interlocutory appeals concerning pendent state law claims of governmental immunity. *See Schack v. City of Taylor*, 177 F. App'x 469, 473-74 (6th Cir. 2006) (unpublished); *Bradley v. City of Ferndale*, 148 F. App'x 499, 511-12 (6th Cir. 2005) (unpublished). We therefore conclude that this court has jurisdiction to consider defendants' interlocutory appeal concerning the denial of qualified immunity to Sgt. Lubelan and Lt. Ellsworth with respect to Livermore's state law claims.

B.

Michigan's governmental tort liability act, MICH. COMP. LAWS §§ 691.1401 *et seq.*, provides governmental employees with immunity from tort liability for injuries they cause during the course of their employment so long as the employee's conduct "does not amount to gross negligence that is the proximate cause of the injury or damage." MICH. COMP. LAWS § 691.1407(2)(c); *see also id.* at § 691.1407(7)(a) (defining "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results"). In her complaint, Livermore alleges a claim of gross negligence against Sgt. Lubelan, contending that Sgt. Lubelan breached a duty owed to Rohm by shooting and killing him, and by failing to understand "activity which constituted an imminent threat of harm to him and others." Although her complaint is articulated in terms appropriate for a negligence claim (e.g., "failing to understand"), Livermore's gross negligence claim against Sgt. Lubelan is undoubtedly premised on the intentional tort of battery. The Michigan courts have consistently "rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004); *see also Smith v. Stolberg*, 586 N.W.2d 103, 104-05 (Mich. Ct. App. 1998); *Sudul v. Hamtramck*, 562 N.W.2d 478, 479, 487-88 (Mich. Ct. App. 1997). Livermore's claim of gross negligence against Sgt. Lubelan is therefore not cognizable under Michigan law, and the district court's denial of defendant's motion for summary judgment with respect to this claim is reversed.

Livermore also alleges a claim of gross negligence against Lt. Ellsworth. As discussed above, governmental employees are immune from tort liability for injuries they cause during the course of their employment, if the employee's conduct "does not amount to gross negligence that is *the* proximate cause of the injury or damage." MICH. COMP. LAWS § 691.1407(2)(c) (emphasis

added).  In *Robinson v. City of Detroit*, 613 N.W.2d 307, 311 (Mich. 2000), the Michigan Supreme Court defined "the proximate cause" under § 691.1407(2)(c) to mean "the one most immediate, efficient, and direct cause preceding an injury . . . ." *Id.* at 317-18.  The *Robinson* court then applied its definition of "the proximate cause" to conclude that police officers in pursuit of an underage driver who was operating a car recklessly were immune from liability for injuries caused to the driver's innocent passengers. *Id.* at 319.  The court reasoned that the proximate cause of the injuries sustained by the plaintiffs was not the officers' decision to chase after the driver, but rather the reckless conduct of the fleeing driver. *Id.*  Similarly, we conclude that the proximate cause of Rohm's death was not Lt. Ellsworth's conduct, but rather Rohm's decision to disregard his promise to surrender unarmed and to set fire to his residence.  Because Lt. Ellsworth's conduct was not the proximate cause of Rohm's death, he is immune from Livermore's claim of gross negligence pursuant to MICH. COMP. LAWS § 691.1407(2)(c). *See also Dean v. Childs*, 705 N.W.2d 344 (Mich. 2005) (reversing denial of summary judgment for defendants, for reasons stated by dissenting opinion in *Dean v. Childs*, 684 N.W.2d 894, 901-03 (Mich. Ct. App. 2004)).

The district court's denial of defendants' motion for summary judgment is reversed.