NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0205n.06
Filed: March 18, 2009

No. 07-4072

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CHRISTA WALTERS and RICK WALTERS, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CHAD STAFFORD and GERALD MARTIN, | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellants. | ) | |

Before: NORRIS, GIBBONS, and GRIFFIN, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Defendants City of Hamilton Police Lieutenant

Gerald Martin and Officer Chad Stafford appeal the order of the district court, which denied in part

their motion for summary judgment. Pursuant to 42 U.S.C. § 1983, plaintiffs Rick and Christa

Walters claimed, *inter alia*, that: both defendants unreasonably seized Rick Walters in violation of

the Fourth Amendment and retaliated against Rick Walters for exercising his First Amendment

rights; both defendants unreasonably searched both plaintiffs in violation of the Fourth Amendment;

and both defendants used excessive force against Christa Walters. All claims were asserted against

Lieutenant Martin and Officer Stafford in their individual capacities. The district court denied

defendants' motion for summary judgment, in which defendants argued that they were entitled to

qualified immunity as to each of these claims. On appeal, defendants argue that the district court

erred because: (1) both defendants are entitled to qualified immunity as to Rick Walters's unlawful seizure claim; (2) both defendants are entitled to qualified immunity as to Rick Walters's retaliation claim; (3) both defendants are entitled to qualified immunity as to plaintiffs' unreasonable search claim; and (4) Lieutenant Martin is entitled to qualified immunity as to Christa Walters's excessive force claim. We agree and reverse the district court's denial of qualified immunity to both defendants as to Rick Walters's unreasonable seizure and retaliation claims, reverse the district court's denial of qualified immunity to both defendants as to plaintiffs' unreasonable search claim, and reverse the district court's denial of qualified immunity to Lieutenant Martin as to Christa Walters's excessive force claim.

## I.

The relevant facts, many of which are in dispute, are as follows. Following a Halloween party on October 31, 2003, the Walters were overnight guests at the residence of their friend, James Evans, and Evans's roommate, Charles Cox. After the Walters retired to one bedroom of the house, Evans was awakened by the sound of a disturbance coming from his backyard and a nearby alley. Due to recent break-ins at his residence and others in the neighborhood, Evans retrieved a firearm from Cox, exited, and fired a shot into the air to disperse the disturbance, which arose from a group of 20 to 30 people in the alley near Evans's backyard.

Unknown to Evans, Hamilton police officers Stafford and Thomas Hurst—who had both previously been dispatched to a house behind Evans's residence—heard one gunshot. Officers Hurst and Stafford ran towards the gunfire and radioed their dispatcher that shots had been fired. After approaching the rear of Evans's residence, the officers saw Evans standing near the porch with a gun in his hand. Officer Stafford contends that after he pointed his own firearm at Evans and told him

2

to put his gun down, Evans pointed his gun at Officer Stafford. Officer Hurst did not corroborate this, and Evans contends he was only pointing the gun towards the melee and someone whom he thought was approaching with a lead pipe. In any event, Officer Hurst stated that he had no reason to believe that the officers had been fired upon. Despite the officers' commands to put the gun down, Evans ran inside his residence, returned the gun to Cox, and soon exited again unarmed.[1]

Evans submitted to the custody of the officers and complied with their instructions. According to Officer Hurst, Evans was taken into custody because he had violated a city ordinance prohibiting discharging firearms within the city limits. According to Officer Stafford, Evans was also arrested for pointing a gun at a police officer.

Responding to the "shots fired" call, more officers[2] and Lieutenant Martin arrived on the scene. While being handcuffed, in response to the questions by either Officer Stafford or Lieutenant Martin, Evans indicated that there were four people and "guns" in the residence. According to Officer Stafford, after being informed that people remained in the residence, Lieutenant Martin then "made the decision to go in and clear out the people, because there was still a firearm in the house and we didn't want anything bad to happen." Officer Stafford also acknowledged in his deposition that: he did not know who was inside the residence; he had no knowledge that anyone in the residence was a convicted felon; and it is not illegal to have a firearm in the interior of a home in the

---

[1] According to Evans's deposition testimony, Evans heard someone telling him to "hold it right there," but could not tell if it was a police officer because it was dark outside and the officers were wearing dark clothing.

[2] It is not clear exactly how many officers responded to the call. Melissa Smith, who was also staying at Evans's house, estimated that by the time she had come out of Evans's residence there may have been eight or nine officers. Charles Cox estimated that he saw "at least five or six [officers]."

City of Hamilton, "other than the fact that we needed it for evidence of a crime." He also stated that the decision to go into the residence was made for "officer safety."

After announcing himself, Officer Stafford entered the residence and commanded all persons inside to put their hands up and exit the residence. Lieutenant Martin was standing at the back exit of Evans's residence with his shotgun resting on the doorframe while Officer Stafford searched the home.

Rick Walters contends that he awoke to the sound of a policeman's voices and walked out of the bedroom door as a policeman pointed a gun at him.[3] The policeman asked whether there was anybody else inside the residence, to which Rick Walters responded that his wife was still inside. Rick Walters then asked his wife to get dressed and come out of the bedroom. According to both plaintiffs, after getting dressed, Christa Walters emerged from the bedroom with her hands up. Rick Walters walked ahead of his wife, and followed instructions to "walk slowly to the back door." He then walked through the back door, down a set of steps, and into the backyard. Christa Walters says she lagged somewhat behind, but eventually walked towards the back door with her hands up.

Officer Stafford contends that, after encountering Christa Walters in the kitchen, he told her to show her hands and go towards the door. At the back of Evans's residence is a doorway with virtually no landing leading down a narrow staircase with a wall on one side and no railing on the other side. Christa Walters claims that she paused at the door to let her husband descend the steps. As she approached the door and was about to take her first step, she claims that she felt a push on her back from behind. She then fell towards the ground, landing on or near others in the yard, and

---

[3] Rick Walters testified that Officer Hurst entered the residence. It is unclear whether Rick Walters confused Officer Stafford for Officer Hurst, but this fact is not relevant to the issues on appeal.

breaking her left wrist. Evans and Rick Walters described her as "flying" over the steps. Rick Walters also claims to have seen an officer push his wife "hard," although he recalls that it was Officer Hurst. Initially, however, in a statement to police, Rick Walters described his wife as being "grabbed . . . and pulled . . . out of the back door." Rick Walters later clarified that by saying "grabbed," he could have meant "pushed." Officer Stafford denies pushing Christa Walters.

According to Lieutenant Martin, as Christa Walters was approaching the exit, he was yelling and gesturing for her to get "out, out, out," while his gun was pointed at the doorway that she was emerging from. Lieutenant Martin contends that Christa Walters appeared hesitant and lowered her hands from head-height to waist-height. This hesitancy, he says, made him suspicious and concerned because the weapon had not yet been located and because "typically . . . when you have a weapon pointed at somebody and . . . you're giving them commands . . . they usually comply. She wasn't very compliant." It is undisputed that Christa Walters had not been searched for weapons at this point.

Lieutenant Martin claims that due to Christa Walters's hesitancy and non-compliance, he pulled her through the door to protect her and the officers. Specifically, when Christa Walters was within arm's length, he contends that he reached with his left arm, took her by the arm and pulled her towards him. But as he was pulling her, he was also focused on the doorway out of concern that others might be exiting, and "at some point [he] let go of her arm." Following the incident, Lieutenant Martin filed a use of force form, in which he indicated that he used force for "self-defense," based on his concern that Christa Walters may have possessed a weapon.

After Christa Walters hit the ground, Rick Walters contends that he exclaimed to the officers, "I saw that," and "I saw what you did." At some point thereafter, Rick Walters contends that he was

5

handcuffed before being placed in a police car. Although he was unable to identify which officer handcuffed him, he claims that he felt like he was handcuffed for "hours and hours." He was told that he was not under arrest, but was nevertheless taken to the police station for questioning. Although officers at the scene had procured an ambulance for Christa Walters, Rick Walters was not permitted to accompany his wife to the hospital.

Officer Stafford contends that when he exited the Evans residence, he did not see Rick Walters in the yard. He then left the scene to procure a consent to search form. When he returned, he followed Lieutenant Martin's instructions to distribute search forms, but again did not see Rick Walters at the scene.

Lieutenant Martin testified that, after exiting Evans's residence, he was occupied with directing officers to: procure a consent to search form; call a squad to tend to Christa Walters; and procure detectives to come to the scene to interview people and search the residence. He also testified that he saw Rick Walters in the yard and informed him that the police had arranged for Christa Walters to be taken to the hospital.

After the house was cleared of people, Evans consented to a search of the residence, in which officers located the weapon used in the shooting. No charges were filed against Rick and Christa Walters. Evans was charged with aggravated menacing, to which he pled guilty.

Rick and Christa Walters's amended complaint alleged seven claims against Officer Stafford, Lieutenant Martin, and yet to be identified officers of the Hamilton Police Department (all in their individual capacities only), and the City of Hamilton. Defendants filed a motion for summary judgment, arguing, *inter alia*, that: (1) defendants were entitled to qualified immunity as to Rick Walters's unreasonable seizure claim; (2) defendants were entitled to qualified immunity as to Rick

Walters's claim that defendants retaliated against him for exercising his First Amendment rights; (3) defendants were entitled to qualified immunity as to plaintiffs' unreasonable search claim; and (4) Lieutenant Martin was entitled to qualified immunity as to Christa Walters's claim that he used excessive force. The district court denied in part[4] the motion for summary judgment, rejecting the arguments listed above.

## II.

This court has jurisdiction over final decisions of district courts of the United States. 28 U.S.C. § 1291. A district court's denial of qualified immunity qualifies as a "final decision" if it turns on a question of law. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Plaintiffs argue that the district court's order was not a final decision because the order concluded that some genuine issues of fact existed. But "regardless of the district court's reasons for denying qualified immunity, [this court] may exercise jurisdiction over the [defendants'] appeal to the extent it raises questions of law." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 402-03 (6th Cir. 2007) (citation and quotation marks omitted). Even if a defendant raises "impermissible arguments regarding disputes of fact," so long as "the defendant also raises the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (citation and quotation marks omitted).

---

[4] The district court granted defendants' motion for summary judgment as to a number of other issues—including the dismissal of the City of Hamilton—that are not currently on appeal.

In this case, although defendants contest some issues of fact, they also raise the purely legal questions of whether the facts alleged support claims of violations of clearly established laws. This court has jurisdiction to hear those issues pursuant to 28 U.S.C. § 1291.

**III.**

We review a denial of qualified immunity *de novo*. *Humphrey v. Mabry,* 482 F.3d 840, 846 (6th Cir. 2007). Where a defendant raises a qualified immunity defense, the plaintiffs bear the burden of proving that officers are not shielded by qualified immunity. *Livermore*, 476 F.3d at 403. Qualified immunity "shields governmental officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Livermore*, 476 F.3d at 403 (internal quotation and citation omitted). Our qualified immunity analysis proceeds in two steps. First, we determine whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). If we answer this question affirmatively, we then ask "whether the right was clearly established . . . in light of the specific context of the case." *Id.*[5]

"For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Feathers v. Aey,*

---

[5] We note that while the Supreme Court recently held that this two-step analysis is no longer mandatory, it "continue[s] to recognize that the *Saucier* protocol is often beneficial." *Pearson v. Callahan*, __ U.S. __, 2009 WL 128768, at *9 (Jan. 21, 2009).

8

319 F.3d 843, 848 (6th Cir. 2003). Although the very action in question need not have been previously held unlawful, the unlawfulness must be "apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Id.* (citing *Hope v. Pelzer,* 536 U.S. 730 (2002)); *see also Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco and Firearms,* 452 F.3d 433, 447 (6th Cir. 2006) ("A right is 'clearly established,' . . . when it is no longer among the 'hazy' area of constitutional issues that might be 'reasonably misapprehend[ed]' by a law enforcement officer at the scene.") (quoting in part *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Overall, because "reasonable mistakes can be made as to the legal constraints on particular police conduct," qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law," *see Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008) (internal citations and quotation marks omitted).

**IV.**

Rick Walters first alleges that he was unlawfully seized when he was handcuffed and forced to go to the police station without arrest or probable cause. The district court concluded that Rick Walters had sufficiently introduced evidence showing a Fourth Amendment violation based on clearly established law at the time of the violation. But defendants argue that plaintiffs have not introduced evidence sufficient to show that either *Lieutenant Martin* or *Officer Stafford* participated in the unreasonable seizures. We agree.

The district court correctly concluded that the evidence introduced could establish that Rick Walters was unreasonably seized after he left Evans's residence. While plaintiffs' brief detention within the Evans's residence qualified as a permissible investigatory seizure under *Terry v. Ohio*,

9

392 U.S. 1, 20 (1968), when Rick Walters was handcuffed, ordered to stay on the lawn, and taken to the police station after leaving the residence, these actions constituted an unreasonable seizure.[6]

However, "each defendant's liability must be assessed individually, based on his or her own actions." *Dorsey,* 517 F.3d at 399 n.4. Rick Walters was not able to identify which officers handcuffed and detained him. Nor does he point to any other evidence from which a reasonable jury could conclude that either Officer Stafford or Lieutenant Martin would be liable for the unreasonable seizure.

**A.**

Based on Lieutenant Martin's title and the role that he played in directing officers' activity at the scene, it appears that he was acting in a supervisory capacity. Therefore, plaintiffs' claim

---

[6] A "seizure" occurs when "there is a governmental termination of freedom of movement through means intentionally applied," *Scott,* 127 S. Ct. at 1776, and where "a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall,* 446 U.S. 544, 554 (1980). Brief investigatory seizures, or "*Terry* stops," are not unreasonable if: (1) an "officer's action was justified at its inception," and (2) the action "was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Perez,* 440 F.3d 363, 369-70 (6th Cir. 2006) (quoting *Terry,* 392 U.S. at 20). The first *Terry* requirement is satisfied where there is "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Id.* at 370 (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). The second *Terry* requirement is met if the detention lasts no longer than necessary to effectuate the purpose of the seizure. *Id.* at 372. On the other hand, "[w]hen police actions go beyond checking out the suspicious circumstances that led to the original [*Terry*] stop, the detention becomes an arrest that must be supported by probable cause." *Smoak v. Hall,* 460 F.3d 768, 780-81 (6th Cir. 2006) (citation and quotation marks omitted). In determining whether this line has been crossed, we consider "the length of the detention, the manner in which it is conducted, and the degree of force used." *Id.*

In this case, the police had reasonable suspicion that criminal activity was afoot. Putting aside the issue of whether the warrantless *entry* was justified, *see infra* Part VI, this suspicion justified verifying the safety of the inhabitants of the residence and removing them from the house.

But after Rick Walters left the house, he alleges that he was handcuffed, ordered to stay on the lawn, placed in the back of the police car, taken to the police station, and detained there for a significant period of time without arrest. These alleged facts establish that (1) Rick Walters was seized, and (2) the detention was longer than necessary to effectuate any possible purpose of the detention.

against Lieutenant Martin could proceed under a theory of supervisory liability. *See, e.g.*, *Ontha v. Rutherford County*, 222 F. App'x 498, 503 (6th Cir. 2007).

Although supervisory officials may be liable in certain situations for their failure to supervise or control individual officers, liability may not be based on a *respondeat superior* basis. *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982). Instead,

> [t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official *at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.*

*Petty v. County of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007) (emphasis added) (quoting *Taylor v. Michigan Dep't of Corrs.,* 69 F.3d 76, 81 (6th Cir. 1995)). "Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Gregory v. City of Louisville,* 444 F.3d 725, 751 (6th Cir. 2006) (quoting *Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir. 1999)). A plaintiff must show that a supervising officer "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on." *Bass,* 167 F.3d at 1048. "Nor can the liability of supervisors be based solely on the right to control employees, or simple awareness of employees' misconduct." *McQueen v. Beecher Community Schools,* 433 F.3d 460, 470 (6th Cir. 2006) (internal citation and quotation marks omitted); *see also Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (supervisor's knowledge of unconstitutional conduct and failure to act did not create supervisor liability).

Lieutenant Martin testified that after exiting Evans's house, he was occupied with directing officers to perform various tasks including procuring consent to search forms, tending to Christa Walters, and calling detectives to the scene. He also testified that he saw Rick Walters and informed

11

him that a squad car had been called to transport Christa Walters to the hospital. Lieutenant Martin did not recall any other events related to the detention of Rick Walters, nor have plaintiffs offered any additional evidence of Lieutenant Martin's activities during this time.

At best the record supports an inference that Lieutenant Martin was aware of the activities at the scene and failed to act. But such a showing is not sufficient to show that he "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct" of offending officers. *See McQueen*, 433 F.3d at 470. Therefore, we conclude that Lieutenant Martin is entitled to qualified immunity with respect to Rick Walters's unreasonable seizure claim.

**B.**

We next turn to Officer Stafford's role. Non-supervisory officers "present for an unconstitutional seizure can . . . be held liable for failure to protect." *Smoak v. Hall*, 460 F.3d 768, 784 -85 (6th Cir. 2006); *Barton v. Norrod*, 106 F.3d 1289, 1299 (6th Cir. 1997) ("a non-supervisory law enforcement officer present at a scene where other officers are violating a person's civil rights may have a duty to intervene"). But, "we have found no cases in this circuit where a nonsupervisory officer who was not present at the scene or did not actively participate in a constitutional deprivation was held liable for the failure to prevent the constitutional violation from occurring." *Smoak*, 460 F.3d at 785.

Rick Walters has not introduced evidence that Officer Stafford personally handcuffed, transported, or detained him. Officer Stafford contends that after leaving Evans's house, he did not see Rick Walters in the yard. He contends that he then left the scene to procure a consent to search form, and upon his return, Rick Walters was no longer at the scene. While we must view the evidence in the light most favorable to Rick Walters, our inferences *must be supported by the record*.

12

*See Scott*, 127 S. Ct. at 1776 n.8. The record here provides no indication that Officer Stafford participated in any of the handcuffing, transport, or detention that could have constituted an unreasonable seizure.

Because plaintiffs have not introduced evidence showing that Officer Stafford violated Rick Walters's constitutional right to be free from unreasonable seizure, we conclude that Officer Stafford is also entitled to qualified immunity as to this claim.

## V.

Rick Walters claims that the same acts that constituted an unreasonable seizure also amounted to retaliation for the exercise of his First Amendment rights. Specifically, Rick Walters contends that, after his wife was pushed down the steps, he exclaimed to the police on the scene, "I saw that" and "I saw what you did," and that the police retaliated against him by handcuffing him and forcing him to go to the police station. The district court denied defendants qualified immunity, again concluding that Rick Walters had introduced evidence showing the violation of a well established constitutional right. Once again, however, we conclude that Rick Walters has not introduced evidence showing that *Lieutenant Martin* or *Officer Stafford* participated in the alleged acts of retaliation.

## A.

To establish retaliation, a plaintiff must show that: (1) he was participating in a constitutionally protected activity; (2) defendant's action injured him "in a way likely [to] chill a person of ordinary firmness from further participation in that activity"; and (3) his constitutionally protected activity partially motivated defendant's adverse action. *Center for Bio-Ethical Reform, Inc. v. City of Springboro,* 477 F.3d 807, 821 (6th Cir. 2007) (citation and quotation marks omitted).

13

If the plaintiff raises an inference that the defendant's conduct was partially motivated by the plaintiff's protected activity, the burden shifts to the defendant to demonstrate that it would have taken the same action regardless of the protected activity. *Id.*

We assume *arguendo* that Rick Walters has introduced sufficient evidence to establish a *prima facie* case of retaliation and that defendants have not provided an alternative explanation for the detention. But because each defendant's liability must be assessed based on his or her own actions, *Dorsey,* 517 F.3d at 399 n.4, we must determine whether Officer Stafford or Lieutenant Martin played any role in the detaining activities alleged to constitute retaliation.

**B.**

**1.**

For the reasons provided above, *see supra* Part V, Rick Walters has not pointed to facts that would show that Lieutenant Martin participated in any of the alleged acts of retaliation, or, in a supervisory capacity, "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of other officers," *see McQueen*, 433 F.3d at 470. Therefore, we reverse the district court and conclude that Lieutenant Martin is entitled to qualified immunity as to Rick Walters's retaliation claim.

**2.**

Viewing the evidence in the light most favorable to Rick Walters, we assume that Officer Stafford was present for Rick Walters's protected speech. After all, the criticism occurred almost

14

immediately after Christa Walters was allegedly pushed off the steps by Officer Stafford[7] and may have been directed towards Officer Stafford. Still, Rick Walters has not identified Officer Stafford or Officer Hurst (whom he may have confused him with) as being present during the alleged acts of retaliation—the detention in Evans's yard, handcuffing, and trip to the police station. Because Rick Walters has failed to introduce evidence showing that Officer Stafford retaliated against him, we reverse the denial of qualified immunity to Officer Stafford as to this claim as well.

## VI.

Defendants next contend that the district erred by not granting them qualified immunity with respect to plaintiffs' unreasonable search claim. Plaintiffs claim that defendants' warrantless entry into Evans's residence amounted to an unreasonable search.[8] Defendants argue that (1) no constitutional violation occurred because exigent circumstances justified their warrantless entry and search of Evans's home; and alternatively (2) defendants did not violate a clearly established constitutional right.

## A.

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). But warrantless entries are permitted under "exigent circumstances." *See, e.g.*, *Causey v.*

---

[7] Again, Rick Walters testified that he thought Officer Hurst pushed Christa Walters off the steps.

[8] Plaintiffs have standing to contest the warrantless entry and search of Evans's residence. As social acquaintances and overnight guests of Evans, plaintiffs had a reasonable expectation of privacy in their host's residence. *See United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000) (citing *Minnesota v. Olsen*, 495 U.S. 91, 95 (1990)).

*City of Bay City*, 442 F.3d 524, 529 (6th Cir. 2006) (citation and quotation marks omitted). Although there is not an exhaustive or inflexible list of circumstances qualifying as exhaustive, *see United States v. Rohrig*, 98 F.3d 1506, 1515,1519-21 (6th Cir. 1996), we have found exigent circumstances to exist where, for example, (1) "officers were in hot pursuit of a fleeing suspect"; (2) "the suspect represented an immediate threat to the arresting officers and public"; or (3) "immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Causey*, 442 F.3d at 529 (citation and quotation marks omitted). Whether exigent circumstances exist is generally an issue for a jury. *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992). But if "the underlying facts are essentially undisputed, and where a finder of fact could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law." *Id.*

Viewing the evidence in the light most favorable to plaintiffs, defendants knew upon entering Evans's residence that: Evans had fired his gun before placing the gun in the residence; Evans was now detained; at least one weapon remained in Evans's residence; and other people remained in Evans's residence. This set of facts creates a close legal issue as to the existence of exigent circumstances justifying entry of the house. Clearly a concern for those still in Evans's home could create an exigency. *See Causey*, 442 F.3d at 529 (exigency existed where "officers . . . reasonably suspected that immediate police action was necessary to ascertain whether someone inside the house was in peril"). In this case, defendants note that when the decision was made to enter the residence, the officers knew that guns and people remained in the residence and that the circumstances

16

surrounding the discharge of the firearm were unclear.[9] Defendants have also noted a concern for the safety of the officers.

## B.

Ultimately, however, it is unnecessary to resolve the issue of whether exigent circumstances justified the warrantless entry. Defendants argue that even if exigent circumstances did not justify their warrantless entry, they did not violate clearly established law as of 2003. The relevant inquiry in this case "is whether an objectively reasonable officer would have believed that exigent circumstances existed to justify the warrantless search in light of clearly established law and in light of the information possessed by the defendants." *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 998 (6th Cir. 1994). In other words, was it "objectively reasonable for the officers to conclude, given

---

[9] In determining whether concern for the inhabitants of a home creates an exigency justifying a warrantless entry, this court has held that while the evidence of firearms within a residence does not create an exigency by itself, "a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent." *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996). This court has previously focused on whether an officer might reasonably conclude that a potential suspect is willing to use a weapon. *Compare Dickerson v. McClellan*, 101 F.3d 1151, 1159-60 (6th Cir. 1996) (exigency existed where officers could reasonably believe suspect was willing to use weapon because he had purportedly fired nine gunshots); *Hancock*, 958 F.2d at 1375-76 (exigent circumstances existed where officers received information indicating that shots had been fired, the suspect was suicidal, possibly homicidal, and had "threatened to kill any police officer who arrived on the scene"); *Estate of Bing v. Whitehall*, 456 F.3d 555, 565 (6th Cir. 2006) (exigent circumstances existed where police were informed that shots had been fired by an intoxicated suspect who could be homicidal and had access to a gun, and bystanders and neighbors were present nearby); *and Causey*, 442 F.3d 530-31 (exigency where officers knew that shots had been fired in a backyard on New Years Eve and that a 911 hangup call had come from the residence earlier, even though residents told officers through the window that no one was injured) *with Bates*, 84 F.3d at 795-96 (no exigency existed where officers had no reason to believe that anyone in the residence was dangerously armed or prone to violence).

the information they had, that immediate action . . . . without first obtaining a warrant was necessary." *Id.*

Even if defendants were incorrect in concluding that exigent circumstances existed, they were not objectively unreasonable in believing in their existence. Here defendants had knowledge of several facts giving rise to a legitimate concern for officer and public safety. Clearly established law did not provide guidance indicating that their course of action was unlawful. Consequently, we conclude that both defendants were entitled to qualified immunity on plaintiffs' unreasonable search claim and reverse the district court's contrary conclusion.

**A.**

As an initial matter, the district court was correct to analyze this claim under the Fourth Amendment. All claims alleging "that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Therefore, "[a] seizure must occur before an excessive force claim is cognizable under the Fourth Amendment." *Dunigan*, 390 F.3d at 492. Plaintiffs have clearly introduced evidence establishing that Christa Walters was "seized." After all, Christa Walters was led out of the house in the middle of the night by armed officers instructing her to walk slowly towards the back door and yelling "out, out, out." This constituted "a governmental termination of freedom of movement through means intentionally applied," *see Scott*,127 S.Ct. at 1776, and a reasonable person in Christa Walters's position would believe that she was not free to leave, *see United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Thus, we analyze this claim under the Fourth Amendment to see if the force used was *unreasonable*.

18

**B.**

"At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party . . . the reasonableness of [an officer's] actions . . . is a pure question of law." *Scott*, 127 S. Ct. at 1776 n.8. Whether a law enforcement officer's use of force is reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (citation and quotation marks omitted). In other words, "we must consider the risk of bodily harm that [the officer's] actions posed . . . in light of the threat to the public that [the officer] was trying to eliminate." *Scott*, 127 S. Ct. at 1778. "Reasonableness" is judged "from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. As we have explained:

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

*Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004) (*quoting Graham*, 490 U.S. at 396-97) (emphasis omitted).

In conducting this "reasonableness" analysis, this court has often looked to: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the police officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *See*, *e.g., Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008) (citing *Smoak*, 460 F.3d at 783). "This standard contains a built-in measure of deference to the officer's on-the-spot

19

judgment about the level of force necessary in light of the circumstances of the particular case." *Smoak*, 460 F.3d at 783 (quotation marks and citation omitted).

Gratuitous violence is never reasonable. *See Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167 (6th Cir. 2004) (where mother presented no danger but violated movie theater policy, it was unreasonable to kick her legs out from under her and throw her into a bookcase); *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir. 1994) (spraying mace on an incapacitated person constituted excessive force). After all, there is "simply no governmental interest" justifying gratuitous violence. *See Phelps v. Coy,* 286 F.3d 295, 302 (6th Cir. 2002).

On the other hand, significant government interests can justify even fairly substantial physical intrusions. For example in *Dunigan,* this court concluded that a police officer did not exert unreasonable force when, in pursuit of a convicted felon, the police officer pushed the felon's 59 year-old mother (the plaintiff) part way down a narrow basement staircase. 390 F.3d at 493-95. In this "chaotic, tense, and rapidly evolving situation," the police officer's actions were reasonable because he was focused on apprehending a potentially fleeing fugitive, and the plaintiff's "presence in the midst of this situation interfered with [the police officer's] efforts to perform his duties." *Id.* at 494.

Clearly, Christa Walters has introduced evidence showing that the force used against her was significant. She and others describe her as "flying" over the steps, and her injury (a broken wrist) is not in dispute. But Christa Walters has not introduced evidence from which a reasonable jury could conclude that *Lieutenant Martin* used unreasonable force. Instead, plaintiffs focus almost exclusively on Officer Stafford and his alleged *push*. No one disputes that this push could constitute

excessive force. But as to Lieutenant Martin, the record only suggests that he *pulled* Christa Walters towards him—with at least some justification.

Although we must view the facts in the light most favorable to Christa Walters—not Lieutenant Martin—Christa Walters does not contest Lieutenant Martin's version of the relevant facts. According to Lieutenant Martin, as Christa Walters was approaching the exit, she appeared hesitant and lowered her hands from head-height to waist-height. This hesitancy made him suspicious because the weapon had not yet been located. Therefore, when she was close enough to reach, Lieutenant Martin claims he grabbed her by the arm and swung her towards him. But, still focused on the doorway and concerned that others might be exiting, he lost his grip.

Christa Walters essentially argues that Lieutenant Martin exercised poor judgment and that he should have been more careful given that she was descending a dangerous set of stairs. But on these facts alone, we do not think a reasonable jury could conclude that Lieutenant Martin used unreasonable force. As in *Dunigan,* Lieutenant Martin was responding to a serious situation. Shots had recently been fired under unclear circumstances. While the shooter had been detained, the gun had not been found. In this "chaotic, tense, and rapidly evolving situation," it is understandable that Lieutenant Martin was focused on the entire scene unfolding and not just on Christa Walters before him. To be sure, if Lieutenant Martin was concerned that Christa Walters might possess a weapon, it seems that the more reasonable approach would have been to frisk her for weapons *before* she descended the precarious stairway. But because reasonableness is judged from the perspective of an officer on the scene and because we recognize the difficulty in making split-second judgments, we decline to second guess Lieutenant Martin's actions under the circumstances. We conclude that Lieutenant Martin used "the amount of force that a reasonable officer in the heat of the moment

21

could have believed was needed." *See Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006).

## VIII.

For the foregoing reasons, we reverse the district court's denial of qualified immunity to both defendants as to Rick Walters's unreasonable seizure and retaliation claims; reverse the district court's denial of qualified immunity to both defendants as to plaintiffs' unreasonable search claim; and reverse the district court's denial of qualified immunity to Lieutenant Martin as to Christa Walters's excessive force claim.