IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2024 Session

FILED
01/28/2025
Clerk of the
Appellate Courts

# CHARLES F. HOLLAND ET AL. V. CHEATHAM COUNTY ET AL.

**Appeal from the Circuit Court for Cheatham County**
**No. CV-6483**          **David D. Wolfe, Judge**

———————————————————

**No. M2024-00631-COA-R3-CV**

———————————————————

In this action filed pursuant to 42 United States Code § 1983, the plaintiffs alleged that the defendant law enforcement officers had violated one plaintiff's constitutional rights by using excessive force when the officers shot and injured him at the scene of a "road rage" incident that did not involve the injured plaintiff. The defendants subsequently moved for summary judgment, arguing that the officers' use of deadly force was objectively reasonable under the totality of the circumstances because the injured plaintiff had appeared at the scene of the road rage investigation suddenly and without warning, had approached the officers rapidly, and had been armed with a rifle. Following a hearing, the trial court granted summary judgment in favor of the defendants and dismissed the action with prejudice, determining, *inter alia*, that the officers' use of deadly force had been objectively reasonable. The plaintiffs timely appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Raymond W. Fraley, Jr., Fayetteville, Tennessee, for the appellants, Charles F. Holland; Kathleen Holland; Charles F. Holland, Jr.; Tyler J. Holland; and Karoline A. Holland.

Mark Nolan and Jeff T. Goodson, Clarksville, Tennessee, for the appellees, Thomas Royal, Paul Ivey, and Walter Bamman.

**OPINION**

**I. Factual and Procedural Background**

This matter arises from an officer-involved shooting that occurred shortly after 8:00 p.m. on January 30, 2017, during which Charles Holland, the injured plaintiff in this action, was shot and wounded outside of his residence in an incident involving three county law enforcement officers: Thomas Royal, Paul Ivey, and Walter Bamman ("the Officers"). The Officers had been dispatched to the area in response to a "road rage" incident categorized as a "rolling domestic assault." The Officers arrived on the scene in separate, marked patrol cars to find a woman, whom they believed to have been involved in the road rage incident, beside a Jeep vehicle, which was parked in the driveway of a home. According to two of the Officers, shortly after they arrived on the scene, they each observed Mr. Holland moving toward them across the home's yard, holding what they described as an "AR-15" assault rifle in a "low-ready" position.

On January 29, 2018, Mr. Holland, along with his wife and their three children (collectively, "the Hollands"), filed a complaint pursuant to 42 United States Code § 1983 in the Cheatham County Circuit Court ("trial court") against Cheatham County ("the County") and the Officers in their official and individual capacities (collectively, "Defendants"). In the complaint, the Hollands alleged, *inter alia*, that the Officers had violated Mr. Holland's rights under the Fourth and Fourteenth Amendments to the United States Constitution when they shot him on his own property after he had exited his residence while lawfully armed and not posing any threat to the Officers. The Hollands further alleged negligence on behalf of the Officers and averred that the Officers had caused Mr. Holland's family emotional distress because the family had witnessed the shooting and its aftermath. Against the County, the Hollands propounded that the County should have instituted policies governing the proper use of deadly force by the Officers such that the shooting might have been avoided.

In the complaint, the Hollands asserted that earlier in the day on January 30, 2017, another incident had occurred on their real property when a vehicle pursued by law enforcement had crashed into the creek behind the Hollands' home.[1] The Hollands averred that the suspects had left the vehicle and fled on foot. Because one of those suspects had not been captured, Mr. Holland had purportedly conversed with the officers on the scene of that incident and asked if they would recommend that he arm himself in order to protect his family. The Hollands stated in the complaint that the officers had advised Mr. Holland "that being armed under the prevailing circumstances was an appropriate precaution."

The Hollands asserted that when the domestic assault situation occurred later that evening, Mr. Holland heard what he thought was a collision and went outside to investigate,

---

[1] The record contains no proof that the Officers were aware of this earlier incident.

encountering a woman who stated that someone was trying to kill her. After Mr. Holland assisted the woman into his residence, he averred that a vehicle pulled into his driveway with "blinding headlights." Mr. Holland then "went out his back door armed with a rifle and rounded the back of his house to investigate the ongoing disturbance on his property" when "[i]n seconds, and without warning, multiple gunshots were fired" at him, striking him and his home and causing him injury. The Hollands alleged that the Officers never identified themselves as law enforcement before firing. The Hollands sought compensatory and punitive damages.

Defendants filed an answer to the complaint on February 27, 2018. In the answer, Defendants denied all liability and asserted, *inter alia*, the affirmative defenses of expiration of the statute of limitations and immunity under the Governmental Tort Liability Act.

On September 25, 2023, after participating in discovery, Defendants filed a motion seeking a grant of summary judgment in their favor, along with an accompanying memorandum of law and statement of undisputed material facts. Defendants argued, *inter alia*, that there was no genuine dispute of material fact and that the complaint should be dismissed with prejudice because the Officers' use of force was objectively reasonable under the totality of the circumstances. These circumstances included that (1) one of the Officers "suddenly discovered" Mr. Holland," who had been "armed with an assault rifle," and was "crouched down" and "scanning the area by looking back and forth"; (2) Mr. Holland had advanced "rapidly" upon the Officers and the female Jeep owner; and (3) Mr. Holland had continued to advance on the Officers, carrying his rifle in a "'low-ready' position" after they commanded him to stop. Defendants averred that the Officers' decision to shoot was a "'split-second' decision, considering only five seconds passed between the moment Mr. Holland began advancing with the assault rifle and the moment [one of the Officers] shouted, 'Shoot him!'" Defendants further averred that Mr. Holland, who "is a former Marine with weapons and combat training," conceded in his previous deposition that "it was reasonable for [the Officers] to perceive him as a threat." In addition, Defendants contended that (1) the Officers had promptly summoned medical help for Mr. Holland and rendered first aid, (2) Mr. Holland had admitted that he had consumed nine beers that day, and (3) a grand jury had reviewed the facts and video footage from the incident and had determined that the Officers had been "fully justified" in their actions.

The Hollands responded in opposition to the motion for summary judgment, arguing that several material facts remained in dispute such that summary judgment was inappropriate. In their response, the Hollands admitted that although Mr. Holland's version of events related to the shooting might be "contradicted by the audio recording," the trial court should not completely discredit his testimony. The Hollands advanced that the "versions of the Officers" also differed from the video recordings "in several significant, material respects." The Hollands contended that there existed several material facts in dispute, including (1) whether Mr. Holland was ever in a stopped position or crouched

down from the time he left his residence until he was shot, (2) whether Mr. Holland had been walking or running, (3) whether Mr. Holland ever advanced towards the Officers and the Jeep, (4) how close Mr. Holland was to the Officers when he was shot, (5) whether Mr. Holland had ever aimed his gun at the Officers, and (6) whether the Officers had given verbal commands to Mr. Holland before shooting him. The Hollands further posited that "if the legal question of immunity depends on which view of the facts is accepted by the jury, summary judgment cannot be granted." *See Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) ("It is the province of the jury, not the court, to decide on the credibility of the defendant's account of the need for force.").

Following a hearing conducted on January 3, 2024, the trial court entered an order on April 25, 2024, granting summary judgment in favor of Defendants. In its order, the court elucidated that it had reviewed the parties' submissions, including the dashcam footage, noting that "[w]here there is such a video record, this Court should 'take the facts as they appear in the video, which may not necessarily be in the light most favorable to the non-moving party,'" citing *Nelson v. City of Battle Creek, Michigan*, 802 F. App'x 983, 985 (6th Cir. 2020).

Following its review of the videos, the trial court made numerous observations and factual findings. The court found that the Officers had responded to a report of a "rolling domestic assault" at night in a rural area. The court also noted that Officer Royal was the first to arrive on the scene in a clearly marked patrol car with the lights flashing. He encountered a woman who was believed to be involved in the road rage incident to which the Officers were responding. While walking with the woman toward the front of her Jeep, Officer Royal saw Mr. Holland with an "AR-15" assault rifle, and Officer Royal and the Jeep owner "immediately ran to the back of her jeep to seek cover." Officer Bamman arrived and joined them behind the Jeep, at which point Officer Royal stated to Officer Bamman, "he had a gun, a rifle." Officer Ivey then arrived, and as he ran to the scene, Mr. Holland "began to move quickly across the yard to the left of the [Officers'] position, carrying the weapon in a 'low-ready' position." Someone shouted, "shoot him," and the Officers fired upon Mr. Holland. The court noted that the entire encounter "lasted only seconds."

The trial court explained that it was required to determine "the objective reasonableness of the officers' use of deadly force from the perspective of a reasonable officer on the scene" and could only consider the circumstances "immediately before the split-second judgment made by the officers before their use of force," citing *Graham v. Connor*, 490 U.S. 386, 396 (1989) and *Livermore v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007). When viewed from this perspective, the court found that the use of force in this case was objectively reasonable. In arriving at this decision, the court noted that the Officers' vehicles were clearly marked and that at least two of those vehicles' lights were flashing, which made it clear to "any observer that a law enforcement action was taking place." The court further determined that all of the Officers "were dressed in clearly

- 4 -

identifiable uniforms, signifying their role as law enforcement." The court stated that with the report of a domestic assault and with the Officers' vehicles clearly demonstrating the presence of law enforcement, it "was objectively reasonable for the officers to view an unknown man with a rifle as a threat." In addition, the court observed that when Officer Royal and the Jeep owner ran for safety and the "gunman" moved "quickly to their left, in semi-darkness holding the rifle in the low ready position," it was objectively reasonable that the Officers viewed Mr. Holland as an immediate threat to the Officers' safety as well as that of the civilian they were protecting.

The trial court explained that although it could not determine from the videos whether the Officers had given any direct commands to Mr. Holland before shots were fired, the incident occurred with such speed that the Officers had to make a split-second decision regarding their use of force. The court further found that the factual disputes asserted by the Hollands did not "rise to the level of a genuine material issue of fact as to the central question of whether the officers' use of deadly force was objectively reasonable." Although the Hollands urged the court to consider the event from earlier in the day as justifying Mr. Holland's arming himself, the court concluded that it could "only consider the events immediately preceding the use of force" when reaching a determination as to whether the use of force was objectively reasonable. The court determined, after reviewing the videos, that "the Officers had no time to try to ascertain the plaintiff's motives or true intentions" when Mr. Holland "moved quickly to their left, in semi-darkness carrying a high-powered rifle."

The trial court noted that "the case law is clear that law enforcement officers are not required to wait until an armed suspect actually points a gun at them" (citing *Thurman v. Hawkins*, No. 13-50-GFVT, 2014 WL 4384387, at * 6-7 (E.D. Ky. Sept. 3, 2014)). The court found that "failure to give a clear command to show hands or to drop the weapon also does not create a material disputed issue in the Court's mind." The court concluded that the Officers' decision to use deadly force on Mr. Holland was an objectively reasonable one and determined that "there was no violation of the plaintiff's constitutional rights, that there are no material disputed issues[,] and the defendants are entitled to judgment as a matter of law." Further noting that the Hollands' claims against the County were barred by the Governmental Tort Liability Act, the court granted summary judgment in favor of Defendants as to all claims. The Hollands timely appealed.

## II. Issue Presented

The Hollands present the following issue on appeal, which we have restated slightly as follows:

> Whether the trial court erred by granting summary judgment in favor of the Officers concerning the Hollands' excessive force claims filed pursuant to 42 United States Code § 1983.

### III. Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)). As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

> [W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. [574,] 586, 106 S. Ct. 1348, [89 L. Ed. 2d 538 (1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the

nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65. Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014). "Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'" *TWB Architects, Inc. v. The Braxton, LLC*, 578 S.W.3d 879, 889 (Tenn. 2019) (quoting *Rye*, 477 S.W.3d at 265).

## IV. Propriety of Grant of Summary Judgment

The Hollands contend that there are several disputed facts that, when viewed in the light most favorable to them as the nonmovants, create a genuine dispute of material fact as to the reasonableness of the Officers' use of deadly force on Mr. Holland. Specifically, the Hollands posit that a jury could reasonably conclude that (1) Mr. Holland was not a suspect and was not subject to being arrested on the day he was shot, (2) Mr. Holland was lawfully armed and within the curtilage of his residential property, (3) Mr. Holland was unaware that law enforcement officers were present before he was shot, (4) Mr. Holland did not move toward the Officers, (5) Mr. Holland moved diagonally across the front yard to get out of the way of the blinding white light, (6) Mr. Holland was not facing the Officers when he was shot, (7) Mr. Holland neither pointed his gun at the Officers nor threatened them in any way as he crossed his yard, (8) Mr. Holland received neither a verbal identification nor a verbal warning from the Officers before the Officers used deadly force, (9) Mr. Holland's rifle was pointed at the ground at all material times, and (10) Mr. Holland did not disobey any orders because the Officers gave him no verbal orders. The Hollands argue that based on these and other disputed facts, a jury could reasonably conclude that Mr. Holland did not pose an immediate threat to the Officers or others because there were no additional indicia of immediate danger beyond Mr. Holland's possession of a firearm such that the Officers' use of deadly force was not objectively reasonable.

The Officers argue that the trial court correctly granted summary judgment in their favor because no genuine dispute of material fact exists. The Officers urge that under the

totality of the circumstances, their use of deadly force on Mr. Holland was objectively reasonable and that no constitutional violation occurred. According to the Officers, they were therefore entitled to qualified immunity. Upon thorough review of the record and applicable authorities, we determine that the trial court did not err in granting summary judgment in favor of Defendants.

The Hollands filed this action pursuant to 42 United States Code § 1983 (West October 19, 1996, to current), which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The Officers herein have claimed qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655-57 (2014). This inquiry includes whether the facts demonstrate that the plaintiff suffered a violation of a constitutional right and whether the right in question was clearly established at the time of the violation. *Pearson*, 555 U.S. at 232. "Courts have discretion to decide the order in which to engage these two prongs." *Id*. at 236.

The United States Supreme Court has held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989).[2] The Court further explained:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. [*Tennessee v. Garner*, 471 U.S. 1,] 8 [(1985)], quoting *United States*

---

[2] *McNabb v. Tennessean Newspapers, Inc.*, 400 S.W.2d 871, 876 (Tenn. Ct. App. 1965) ("[W]e are bound in questions involving the Constitution of the United States by decisions of the U.S. Supreme Court construing that document[.]").

*v. Place*, 462 U.S. 696, 703, 103 S. Ct. 2637, 2642, 77 L. Ed. 2d 110 (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *See Terry v. Ohio*, 392 U.S. [1,] 22-27 [(1968)]. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884, 60 L. Ed. 2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *See Tennessee v. Garner*, 471 U.S., at 8-9, 105 S. Ct., at 1699-1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Terry v. Ohio*, *supra*, 392 U.S., at 20-22, 88 S. Ct., at 1879-1881. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, *Hill v. California*, 401 U.S. 797, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, *Maryland v. Garrison*, 480 U.S. 79, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987). With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 F.2d [1028,] 1033 [(2d Cir. 1973)], violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Graham*, 490 U.S. at 396-97.

We reiterate that when evaluating a motion for summary judgment, the trial court must accept the nonmoving party's evidence as true and view the evidence and all reasonable inferences that can be drawn therefrom in favor of the nonmoving party. *See*

- 9 -

*Shipley v. Williams*, 350 S.W.3d 527, 551 (Tenn. 2011). However, when video evidence exists that irrefutably contradicts the nonmovant's version of the facts, the trial court may accept the facts as shown on the video and grant summary judgment in the movant's favor if no other genuine issue of material fact remains. *See Jones v. Publix Supermarket, Inc.*, No. M2018-01672-COA-R3-CV, 2019 WL 2404975, at *4-5 (Tenn. Ct. App. June 7, 2019) (upholding a trial court's grant of summary judgment when video evidence conclusively contradicted the nonmovant's version of facts); *Keirsey v. K-VA-T Food Stores Inc.*, No. E2018-01213-COA-R3-CV, 2019 WL 1301758, at *6 (Tenn. Ct. App. Mar. 20, 2019) (same); *Hall v. Owens*, No. W2014-02214-COA-R3-CV, 2015 WL 7354384, at *4 (Tenn. Ct. App. Nov. 20, 2015) (same).[3]

Here, the Hollands argue that viewing the facts in the light most favorable to them would lead to the conclusion that at the time of the incident, Mr. Holland was (1) lawfully armed, (2) within the curtilage of his own property, and (3) unaware of the presence of law enforcement officers before he was shot. We note, however, that these facts are immaterial to the analysis of whether the Officers' actions were "'objectively reasonable' in light of the facts and circumstances confronting them." *See Graham,* 490 U.S. at 397. As the United States Supreme Court has explained: "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Ergo, the relevant question here is what facts were known to the Officers at the time of the incident, not what facts were known to Mr. Holland.

The Hollands postulate that the trial court should have considered the earlier car chase ending on their property when judging the reasonableness of the Officers' decision to use deadly force because this circumstance justified why Mr. Holland was in his yard holding his gun in the first place. We disagree. Although the proper application of the objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case," *see Graham*, 490 U.S. at 396, a court can only consider the circumstances immediately prior to the officer's use of force. *Livermore v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (explaining that courts should only "focus on the 'split-second judgments' made immediately before the officer used allegedly excessive force").[4]

---

[3] We note that federal precedent concerning this issue is in accord. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (stating that when the nonmovant's "version of events is so utterly discredited by the [video evidence in the] record that no reasonable jury could have believed him," the lower court "should have viewed the facts in the light depicted by the videotape."); *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) ("To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos.").

[4] "Though they are persuasive authority when interpreting the United States Constitution, this Court is not bound by decisions of the federal district and circuit courts. We are bound only by decisions of the United States Supreme Court." *State v. Carruthers*, 35 S.W.3d 516, 561 (Tenn. 2000).

- 10 -

Events leading up to a shooting incident should not be considered when determining whether law enforcement officials had probable cause to use deadly force at the time of the shooting. *See Chappell v. City Of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009); *see also Livermore*, 476 F.3d at 407 (explaining that courts should disregard "the hours and minutes leading up to" an excessive force incident and focus only on what occurred "immediately" before). "[W]hether the use of deadly force at a particular moment is reasonable depends primarily on an objective assessment of the danger a suspect poses <u>at that moment</u>." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007) (emphasis added); *see Nelson v. City of Battle Creek, Michigan*, 802 F. App'x 983, 985 (6th Cir. 2020) (explaining that although a defendant seeking qualified immunity at the summary judgment stage must concede facts as alleged by the plaintiff, the court must consider "only the facts that were knowable to the defendant officer" at the moment of the use of force). Accordingly, even if a jury could conclude that Mr. Holland was not a suspect and was lawfully armed within the curtilage of his residential property at the time of the incident, these conclusions cannot weigh on the objective reasonableness of the Officers' use of deadly force because they were not established as "circumstances immediately prior to the officer's use of force" that were known to the Officers. *See Livermore*, 476 F.3d at 407.

In their brief, the Hollands aver that earlier during the day of the shooting, Mr. Holland had been advised to remain armed by law enforcement after two fleeing suspects drove onto the Holland property, crashed their vehicle, and one potentially armed suspect eluded capture. The Hollands further proffer that when Mr. Holland later heard a vehicle collision close to his home and investigated, he discovered a woman in a car yelling for help and stating that someone was trying to kill her. The driver of another car, whom he assumed to be the woman's alleged assailant, almost hit him with that car before leaving the scene, and Mr. Holland ushered the woman into his home for protection. The Hollands claim that Mr. Holland subsequently went outside to find the person threatening the woman and was blinded by white lights, such that he moved diagonally away from the light and across his yard to avoid the lights' harshness. We agree with the trial court's determination that "while Mr. Holland may have felt that his actions that night were justified by the events which occurred earlier in the day . . . the Court cannot consider those facts in reaching the determination of the objective reasonableness of the officers' use of force." We, like the trial court, are constrained when evaluating the objective reasonableness of the Officers' actions to only consider the circumstances both knowable to the Officers and occurring immediately prior to the Officers' use of force. *See Livermore*, 476 F.3d at 407. Therefore, the reason that Mr. Holland was in his yard with a gun in the first instance is irrelevant to the inquiry.

We reiterate:

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application[;]" however, its proper application requires careful attention to the facts and circumstances of each

- 11 -

particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396-97 (internal citations omitted). The three factors listed in *Graham* are a "non-exhaustive list" of factors to "help inform our ultimate inquiry, which must always be 'whether the totality of the circumstances' justified the use of force." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (internal citations omitted).

The Hollands argue that the three *Graham* factors weigh against a finding of objective reasonableness. We disagree. We determine that the first *Graham* factor, the severity of the crime, *see Graham*, 490 U.S. at 397, supports the Officers' use of force because it is undisputed that at the time of the incident, the Officers had been responding to a report of a dangerous situation involving road rage and domestic violence. We likewise discern that the third *Graham* factor, whether the suspect is attempting to resist or evade arrest, *see id.*, weighs in favor of the Officers as well because it would be reasonable for an officer responding to a domestic violence call to believe that a man holding a weapon and quickly moving across the yard, as Mr. Holland was shown to do in the dashcam footage, could be attempting to resist arrest or escape the scene of a crime.

The controversy in this case centers on the second *Graham* factor, whether the suspect posed an immediate threat to the safety of the Officers or others. *See id.* Regarding this factor, the Hollands argue that the trial court should have considered that at the time of the incident, Mr. Holland was moving diagonally across his yard rather than toward the Officers, his gun was pointed at the ground rather than at the Officers, and he neither received nor disobeyed any verbal orders or warnings. We recognize that the Sixth Circuit has clearly stated that "we do not hold that an officer may shoot a suspect merely because he has a gun in his hand." *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017). A suspect having a weapon "constitutes just one consideration in assessing the totality of the circumstances." *Id.* Accordingly, a suspect's possession of a firearm absent a threat of danger to the officer or others is insufficient to justify an officer's use of deadly force. *See Bouggess*, 482 F.3d at 896. The "threat factor is 'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" *Mullins*, 805 F.3d at 766 (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)). *See Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public.").

However, "when a police officer both knows a defendant has a weapon *and* has a reasonable belief that the weapon will be used against him or others, the officer is justified in using deadly force." *Bouggess*, 482 F.3d at 896. "In sum, probable cause exists when

- 12 -

officers 'could reasonably conclude that a suspect might fire a gun at them or use another dangerous weapon against them (even if they turned out to be wrong).'" *Cooper v. City of Columbus*, No. 22-3251, 2023 WL 1434055, at *6 (6th Cir. Feb. 1, 2023) (citing *Gambrel v. Knox Cnty.*, 25 F.4th 391, 405-06 (6th Cir. 2022)).

Moreover, "aiming a weapon is not a minimum requirement[.]" *Cooper*, 2023 WL 1434055, at *6 *(*citing *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019) ("[A]n officer need not face the business end of a gun to use deadly force.")). "The Sixth Circuit has been clear that deadly force can be reasonable even if the suspect does not point a firearm at the officers." *Ball v. Cocke Cnty.*, No. 3:19-CV-445, 2021 WL 601169, at *4 (E.D. Tenn. Feb. 16, 2021) (citing *Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018)). "A suspect does not even have to raise the firearm." *Ball*, 2021 WL 601169, at *4.

Here, it is undisputed that: (1) the Officers arrived at Mr. Holland's residence in response to an incident that had been characterized as "road rage" and a "rolling domestic assault," (2) the Officers were called to respond to the incident at a location close to the Holland residence, and (3) the Officers stopped behind the Jeep right outside the Holland residence because they believed the woman in the Jeep was involved in the potential domestic violence situation. It is also undisputed and shown in the video evidence from Officer Royal's dashcam that when Officer Royal approached the woman, she exited the Jeep, was visibly distraught, and pointed toward the road and the Holland residence. At this point, Officer Royal began to follow her toward the house, which appears to coincide with the moment when Mr. Holland admittedly walked "with haste" into the yard while holding his rifle. Meanwhile, the dashcam video evidence also demonstrates the obvious, visible presence of law enforcement at the scene. Upon review, we agree with the trial court's conclusion that the videos clearly showed "that Royal's unit had its overhead lights flashing and Bamman's unit had its blue lights flashing. In either event, it was clear to any observer that a law enforcement action was taking place." Although Mr. Holland claimed that he saw no blue lights flashing, his testimony was fully discredited by contradictory video evidence.

Despite the Officers' use of sirens and lights on approach and the continued use of strobing blue lights by the Officers upon arriving at the scene and parking their marked patrol cars,[5] Mr. Holland admittedly moved diagonally across the front yard to the left of the Officers and the civilian while holding a rifle. Although he claimed to be unaware of the presence of law enforcement officers at the time, Mr. Holland acknowledged that he exited his home while carrying a rifle in his hands in a "low ready position" with the muzzle pointed toward the ground. The video demonstrates that at the time the Officers used deadly force, Mr. Holland was moving into a position to the left of the Officers such that

---

[5] The dashcam footage demonstrates that both sirens and blue lights were employed until the Officers reached the scene, at which time the use of sirens was discontinued, but the blue lights remained strobing.

the Officers and the woman behind the Jeep would soon be exposed to Mr. Holland and within his visual and firing range.

In *Thornton*, 727 F. App'x at 829, the Sixth Circuit upheld a district court's finding of qualified immunity under similar circumstances. The *Thornton* Court found that the defendant officers' use of deadly force was objectively reasonable when, upon viewing the facts and drawing all inferences in favor of the plaintiff, the following circumstances were established: the officers had been responding to a call concerning a man previously threatening others with a firearm, the officers had been told that the man was inside a certain residence, and upon their entry into that residence, a man holding a firearm walked into the room with the officers. *Id.* at 837. In addition, the officers claimed to have announced their presence and given the suspect verbal orders to disarm, but the suspect claimed that he had not heard those orders and thus did not comply. *Id.* Significantly, the suspect had not pointed the gun or shot at the officers before the officers' use of deadly force. *Id.* at 837-38. The Sixth Circuit in *Thornton* found that there was "no dispute that the officers could have reasonably believed that the man with the shotgun was the same man who had, only moments earlier, threatened another person with a gun." *Id.* at 837. The Court concluded that "because the deadly threat posed by Thornton could have easily and quickly transformed into deadly action in a split-second, any reasonable police officer in the officer's position would know that a decision to use deadly force would need to be rendered quickly." *Id.*

Similarly, here, the Officers were (1) responding to a potentially violent crime, (2) used sirens and strobing blue lights to announce their presence on the scene, and (3) immediately interacted with a person at the scene who was visibly distraught and gestured toward the road and Mr. Holland's house. Mr. Holland then advanced from the home and was observed to be armed and approaching the Officers' position. Mr. Holland did not raise his weapon or point it at the Officers and did not react to the Officers' shouts before the Officers began shooting.[6] Consistent with *Thornton*, we determine that the Officers could reasonably have believed that Mr. Holland was the same man who was involved in the domestic violence situation. We similarly determine that the situation presented here could have "easily and quickly transformed into a deadly action in a split-second" such that the Officers were reasonable in believing that Mr. Holland posed an immediate threat to their safety or to the safety of others. *See id.* Therefore, all three *Graham* factors weigh in favor of a finding that the Officers' use of deadly force on Mr. Holland was objectively reasonable. *See Graham*, 490 U.S. at 397.

---

[6] Although the dashcam footage also contains audio, the audio is somewhat muffled and unclear. The footage demonstrates that after the Officers observed Mr. Holland, one officer could be heard to exclaim about a gun. The Officers then began shouting at Mr. Holland, but their words are indecipherable except that one officer can be heard to yell, "Stop!" Officer Royal stated in his deposition that he had given a command to Mr. Holland to stop and show his hands. Officer Bamman stated in his deposition that he had told Mr. Holland to stop and drop the gun. Officer Ivey, who was last to arrive on the scene, stated that he did not have time to issue a command but could hear the other Officers screaming at Mr. Holland.

- 14 -

As is undisputed by the parties and shown in the video evidence from Officer Royal's dashcam, the Officers and the woman quickly moved behind the Jeep concurrent with Mr. Holland's admittedly "hast[y]" diagonal movement across the yard while holding his gun in his hands. The Hollands argue that "from this point of relative safety," the Officers had the opportunity to shout to Mr. Holland and issue a verbal warning. The Hollands also contend that the Officers' failure to issue a verbal warning to Mr. Holland when such a warning was feasible made the Officers' exercise of deadly force unreasonable. The Hollands rely on United States Supreme Court precedent stating:

> If the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, <u>where feasible</u>, some warning has been given.

*Garner*, 471 U.S. at 11-12 (emphasis added). The United States Supreme Court has cautioned against a rigid application of *Garner*, however, explaining:

> *Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute "deadly force." *Garner* was simply an application of the Fourth Amendment's "reasonableness" test to the use of a particular type of force in a particular situation.

*Scott v. Harris*, 550 U.S. 372, 382 (2007) (internal citation omitted).

In *Garner*, an officer had shot and killed a minor who was fleeing the scene of a crime; who was neither armed nor otherwise apparently dangerous; and who had not, to the knowledge of the pursuing officers, been involved in a crime involving serious harm or violence to others. *Garner*, 471 U.S. at 3-4. The idea that the preconditions from *Garner* have "scant applicability" to a case with "vastly different facts," *see Scott*, 550 U.S. at 383, is further bolstered by *Garner* itself wherein the Court found that the officer "could not reasonably have believed that Garner—young, slight, and unarmed—posed any threat. Indeed, [the officer] never attempted to justify his actions on any basis other than the need to prevent an escape." *Garner*, 471 U.S. at 21. The *Garner* Court found that the officer's decision to use deadly force rested solely "on the fact that Garner had broken into a house at night," and the Court held that "the fact that Garner was a suspected burglar could not, without regard to the other circumstances, automatically justify the use of deadly force." *Id.*

We find the Hollands' reliance on *Garner* to be unavailing. Whereas *Garner* involved the use of deadly force upon an unarmed, fleeing suspect, this case involved the use of deadly force on someone who was armed and who was not running away—instead,

- 15 -

he was advancing on the officers' position. We likewise find the other cases cited by the Hollands to be unpersuasive due to their differing circumstances from those presented in the case at bar. See *Bouggess*, 482 F.3d at 892 (holding that deadly force was not objectively reasonable when no verbal warning was given although feasible because the suspect was fleeing the scene and posed no threat); *see also Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) (holding that deadly force was not objectively reasonable when no verbal warning was heard before an officer shot at two men with a high probability of hitting both while definitively knowing that one of the men was not a suspect); *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) (holding that deadly force was not reasonable when no verbal warning was given and the suspect had his hands up telling the officer not to shoot). The circumstances in these cases relied on by the Hollands are entirely different from those faced by the Officers in this matter because Mr. Holland was neither running away nor asking the Officers not to shoot, and his lack of involvement in the domestic violence incident was unknown to the Officers.

Moreover, we find the plain language of *Garner* to necessitate only that "some warning" be given <u>if feasible</u>. *Garner*, 471 U.S. at 11 (emphasis added). Our review of the dashcam footage in this matter demonstrates that the entire incident from the time of the Officers' arrival at the scene to the time of the shooting lasted mere seconds. Based on the circumstances presented, we agree with the trial court's finding that the Officers' "failure to give a clear command to show hands or to drop the weapon also does not create a material disputed issue in the Court's mind."

In its order granting summary judgment, the trial court relied on *Thurman v. Hawkins*, a district court case from the Eastern District of Kentucky for its determination that "[o]fficers don't have to wait until an armed suspect points a gun at them before it is 'objectively reasonable' to use deadly force." *See Thurman*, No. 13-50-GFVT, 2014 WL 4384387, at * 6-7 (E.D. Ky. Sept. 3, 2014). The Hollands argue in their brief that the statement in *Thurman* most analogous to the court's holding is "[a]t least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force." *Id.* at *6 (citing *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009)). The Hollands argue that the omitted qualification, "at least where orders to drop the weapon have gone unheeded" is the pivotal condition that was not present here because there is no proof that the Officers gave Mr. Holland a verbal warning. We disagree. We find the statement from *Thurman* most analogous to the trial court's holding (and emphasized by the trial court in its order) to be "the court found that fact [that the gun was not pointed directly at the officers] to be immaterial to the ultimate outcome." *Id.*

In *Thurman*, the district court upheld the officers' decision to use deadly force when three officers, responding to a report of domestic violence, entered the residence of a man who had outstanding arrest warrants for assault and burglary. *Id*. at *4. The officers found the man, drunk and holding a gun to his own head. *Id*. at *6. The officers proceeded to

- 16 -

use deadly force after a four-minute standoff and a verbal warning wherein the officers asked the man to drop his gun and he refused. *Id.* at \*4. The officers had also unsuccessfully tried to subdue the man with a taser before resorting to deadly force. *Id.* at \*1-2. Although *Thurman* mentions unheeded verbal orders from an officer as an example of a circumstance contributing to the reasonableness of an officer's decision to use deadly force, we note that neither *Thurman* nor any of the cases cited therein specifically require a verbal warning from an officer before the use of deadly force can be found objectively reasonable, even when a weapon is not directly pointed at an officer or bystander. *See Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997) (holding that when the officer "faced a decision fraught with danger . . . Montoute's unexplained refusal to obey the repeated orders to drop the sawed-off shotgun provided <u>an additional basis</u> for inferring that he presented a risk of serious physical injury to an officer or someone else") (emphasis added); *see also Garczynski v. Bradshaw*, 573 F.3d 1158, 1169 (11th Cir. 2009) (explaining that "[e]ven if we assumed that Garczynski did not point his gun in the officers' direction, the fact that Garczynski did not comply with the officers' repeated commands to drop his gun justified the use of deadly force <u>under these particular circumstances</u>") (emphasis added).

In the case at bar, we find the alleged lack of a verbal warning to be but one factor in our analysis of the totality of the circumstances concerning reasonableness. Given the totality of the circumstances, including the rapidity with which the events transpired, the exposed position of the Officers and a civilian when confronted with an armed and unknown person, the knowledge the Officers possessed regarding the reason they had been called to the scene, and the Officers' employment of their lights and sirens to make known their presence upon arrival at the scene, we conclude that it was reasonable for the Officers to have acted quickly without first issuing verbal commands to Mr. Holland to drop his weapon.

The Hollands further argue that the Officers' use of deadly force was unreasonable because the Officers could have feasibly attempted non-lethal means to de-escalate the situation. For example, the Hollands contend that the Officers could have ordered Mr. Holland to drop the gun, and they urge that if the need for deadly force could have been eliminated by a command from the Officers to Mr. Holland to drop his weapon, the use of deadly force was unreasonable. We disagree. "The Fourth Amendment reasonableness standard does not turn on the availability of less intrusive alternatives." *Collins v. Nagle*, 892 F.2d 489, 493 (6th Cir. 1989). We reiterate the holding in *Graham*:

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 397 (1989). Accordingly, courts must adopt a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light

- 17 -

of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). "*Graham*'s prohibition on using 20/20 hindsight 'carries great weight' when 'all parties agree that the events in question happened very quickly.'" *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).

We discern no dispute of fact as to the swiftness with which the incident in question took place. Despite the parties' arguments concerning certain timestamps for events shown in the dashcam footage, our review of the footage demonstrates that the entire interaction between the Officers and Mr. Holland lasted mere seconds. *See Nelson*, 802 F. App'x at 985-86 ("When there is a video record of the incident, we take the facts as they appear in the video, which may not necessarily be in the light most favorable to the nonmoving party."). The video also establishes that Mr. Holland, who was clearly armed and whose intent was unknown to the Officers, rapidly moved across the yard to the left of the Officers such that their position and that of an unarmed civilian was exposed within a matter of seconds. As the trial court found:

> With the report of a domestic assault, and with the patrol units clearly demonstrating that they were law enforcement, the Court finds it to be objectively reasonable for the officers to view an unknown man with a rifle as a threat. When Royal and [the female Jeep owner] ran from their encounter with the gunman, only to see him moving quickly to their left, in semi-darkness holding the rifle in the low ready position, the Court finds it to be objectively reasonable that he was viewed as an immediate threat to the safety of the officers and the civilian taking cover with them. While the Court could not determine from the videos that any direct commands were made to show hands or drop the weapon, the incident occurred so quickly, that the officers had to make a split-second decision to use force. This Court finds their use of force to be objectively reasonable.

Giving the proper deference to the Officers' "on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case," *see Burchett*, 310 F.3d at 944, we likewise conclude that the Officers' actions were objectively reasonable. We therefore affirm the trial court's grant of summary judgment in their favor, determining that the Officers' use of force did not violate Mr. Holland's constitutional rights.

## V. Conclusion

For the foregoing reasons, the trial court's grant of summary judgment in favor of Defendants is affirmed. We remand this matter to the trial court for collection of costs assessed below. Costs on appeal are assessed to the appellants, Charles F. Holland; Kathleen Holland; Charles F. Holland, Jr.; Tyler J. Holland; and Karoline A. Holland.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE